# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **TRACEY M. TOOLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12-cv-1050** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Susan E. Cox** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tracey M. Tooley seeks judicial review of a final decision by the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. The Commissioner has also filed a motion for summary judgment. For the reasons discussed herein, the plaintiff's motion to remand is denied [dkt. 27] and the Commissioner's motion for summary judgment is granted [dkt. 30].

## I. Procedural History

On April 1, 2009, plaintiff filed an application for DIB and a period of disability beginning on September 29, 2007.[1] She alleged an inability to work due to depression and Bipolar 1 disorder.[2] Plaintiff's claim was denied on July 30, 2009.[3] Plaintiff then filed a request for reconsideration within the permitted 60 days following the Notice of Disapproved Claim, which was again denied

---

[1]R. at 202.
[2]R. at 230.
[3]R. at 133.

on December 23, 2009.[4] On February 17, 2010, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[5]

Plaintiff's request was granted and a hearing took place before ALJ Marlene R. Abrams on July 15, 2010 in Orland Park, Illinois.[6] Also appearing at the hearing was an impartial vocational expert ("VE"), Pamela Tucker, and medical expert ("ME"), Larry Kravitz, M.D.[7] Following the hearing, the ALJ issued an unfavorable decision, finding plaintiff not disabled at anytime from September 29, 2007, through the date of the decision, September 23, 2010.[8] Plaintiff filed a request for review of the ALJ's decision with the Office of Social Security Administration Appeals Council ("Appeals Council") on November 4, 2010.[9] The Appeals Council denied plaintiff's request for review on December 22, 2011.[10] Thus, the ALJ's September 23, 2010 decision stands as the final decision of the Commissioner.[11] Plaintiff filed this action on February 10, 2012.

## II.  Background Facts

The facts set forth under this subsection provide a brief review of the plaintiff's background and the events that led to her application for DIB. They are derived from the medical record, which the ALJ reviewed at the hearing on July 15, 2010 and considered when rendering her decision on September 23, 2010.

---

[4]R. at 145.
[5]R. at 148.
[6]R. at 36.
[7]*Id.*
[8]R. at 13.
[9]R. at 10.
[10]R. at 1.
[11]R. at 13.

Plaintiff was born on March 25, 1977, making her thirty-three years of age on the date the ALJ issued her final decision.[12]  She received her GED and had been going to college on and off from 1996 to roughly 2005.[13]  Between May 1996 and June 2010, she held nine different jobs: customer service representative, warranty clerk, receiving clerk, receptionist, call center operator, bank teller, stock person at a department store, telemarketer, cashier, and waitress.[14] These jobs required her to interact with customers in person and over the phone, enter data into computers, clean, stock, and collect money.[15]

On her first disability report, plaintiff indicated that she began experiencing bipolar disorder and depression on September 29, 2007.[16]  She claimed that these ailments did not allow her to work a job because the illnesses caused her to have attendance problems.[17] She also claimed that these ailments prevented her from interacting with customers and other people in her work environment and, therefore, she could not hold a steady job.[18]

## A.        Pre-filing Medical History

A review of plaintiff's medical records prior to her application for disability helps to set the framework for her overall medical history. We first mention a few ancillary records that begin in April 2007. This is when she visited Victoria Adeleye, M.D. regarding a sore throat.[19] A physical exam showed signs of anemia, shoulder pain, obesity, and neurotic depression.[20] Plaintiff was

---

[12]R. at 202.
[13]R. at 50,
[14]R. at 52, 54 - 55, 58, 59, 237-41, 243-46.
[15]*Id.*
[16]R. at 226.
[17]R at 59.
[18]R. at 79-81
[19]R. at 442.
[20]R. at 443.

prescribed medication for her obesity and for her depression.[21] On June 7, 2007, plaintiff was seen again, and her medications were increased.[22] Around this same time, plaintiff also visited Brian Becker, M.D.[23] During her three visits with Dr. Becker, she was diagnosed with major depressive disorder and obesity, and notes indicate that she believed, "the onset of the depression [had] been gradual and occurring in an intermittent pattern for years."[24] Dr. Becker initially prescribed her Zoloft for her depression, and increased her prescription on both subsequent visits.[25]

Then in 2008, plaintiff began seeing Nagarakanti Nageswara Rao, M.D. at Gateway Foundation's Aurora Treatment Center ("Gateway").[26] Plaintiff visited Dr. Rao eighteen times between February 26, 2008 and June 3, 2009 and through the course of treatment she was prescribed the following medications for her depression and sleep deprivation: Zoloft, Abilify, Trazodone, Trileptal, Lithium, Wellbutrin, Geodon, Remerol, Depakote, and Klonopin.[27] During these visits, plaintiff complained that she had symptoms of mood swings and problems sleeping.[28] There are also records during this time period of her visits to her therapist, also at Gateway. These treatment notes reflect plaintiff's ongoing progress, but an inability to "complete treatment goals" because she was moving out of the coverage area.[29] It was during this course of treatment that plaintiff applied for disability benefits.

---

[21]*Id.*
[22]R. at 435.
[23]R. at 463.
[24]*Id.*
[25]R. at 460, 462, 464.
[26]R. at 521.
[27]R. at 497-508.
[28]*Id.*
[29]R. at 534.

## B.    Post-filing Medical History

By July 2009 plaintiff had changed treatment centers to Aunt Martha's Medical Center ("Aunt Martha's") because she had moved and her address was no longer in the coverage area of Gateway.[30] But there are few treatment records from Aunt Martha's before records show that she was evaluated by the SSA; on July 27, 2009, plaintiff underwent a Mental Residual Functional Capacity Assessment for the Social Security Administration ("SSA"), performed by Donald Henson, PH. D.[31] Dr. Henson's overall review was that plaintiff "possesses sufficient cognitive and attentional abilities to perform simple routine activities" and that her skills would be adequate "for vocational involvement."[32] He also performed a psychiatric review of plaintiff, also for the SSA, and found that she had a "disturbance of mood" and "bipolar syndrome" but found no marked functional limitations.[33] On December 20, 2009, Lionel Hudspeth, Psy. D., reviewed Dr. Henson's findings, and signed a document affirming his opinion.[34] He further concluded that plaintiff was credible, her condition "well controlled," and that she was "able to prepare meals," perform "household chores, shop, read and watch television."[35]

Between October 15, 2009 and March 25, 2010, Plaintiff had four visits with J. Hussain, Psy.D. at Aunt Martha's.[36] During these visits, Dr. Hussain prescribed plaintiff Seroquel, Cymbalta, and Klonopin.[37]  While seeing Dr. Hussain, plaintiff complained of problems sleeping and mood

---

[30]R. at 568.
[31]R. at 539.
[32]R. at 539.
[33]R. at 544.
[34]R. at 557.
[35]R. at 557.
[36]R. at 560-563.
[37]*Id.*

swings.[38] Dr. Hussain also noted that plaintiff had been off of her medications for two or three months prior to her first visit.[39]

One year later plaintiff began seeing Julia Drake, a Licensed Clinical Social Worker ("LCSW"), at Aunt Martha's, though it is not clear how often. Relevant to her application for disability, however, is that she initiated treatment with her on July 9, 2010, and four days later Ms. Drake filled out an impairment questionnaire for the SSA.[40] This questionnaire is important because it is the only record that finds plaintiff unable to work. Specifically, the form indicates her impairments prohibit her from working "more than three times a month."[41] Ms. Drake also checked the following boxes on the form: mood disturbance, constantly changing emotions, social withdrawal, decreased energy, recurrent panic attacks, inability to experience pleasures, irrational fears, psychomotor agitation, generalized persistent anxiety, feelings of guilt/worthlessness, difficulty concentrating, and hostility and irritability.[42] Ms. Drake noted that plaintiff's ability to tolerate stress was severely impacted, and that plaintiff was a severe insomniac.[43]

### C.        July 15, 2010 ALJ hearing

Plaintiff's hearing before the SSA took place on July 15, 2010.[44] Plaintiff appeared in person and was represented by her attorney, Andrew Barone.[45] A VE, Michelle Peters, and an ME, Larry Kravitz, M.D., testified as well.

---

[38]*Id.*
[39]R. at 563.
[40]R. at 576.
[41]R. at 577.
[42]*Id.*
[43]R. at 577.
[44]R. at 36.
[45]*Id.*

Plaintiff first responded to questions from the ALJ. She discussed her schooling history and her previous work.[46] Plaintiff explained that she was fired from several jobs because she missed work.[47] Plaintiff explained that she had three children, two of live with her, and the other child lives with her ex-husband.[48] The ALJ then had plaintiff explain her capabilities; she can drive, can shop at the grocery store once a month, and can go to doctors appointments but misses some.[49] Plaintiff stated that she cared for the children by herself with her mother's assistance.[50] Plaintiff stated that her daughter failed seventh grade because she did not do her homework and plaintiff did nothing to help.[51] Plaintiff stated that she moved recently because her unemployment benefits ran out and she did not pay her rent.[52] Plaintiff testified that she was back on unemployment and agreed that she was required to continue to look for work to receive benefits.[53]

The ALJ then asked about her medical care.[54] Plaintiff stated that she visited her primary care physician about four times a year, visited her psychiatrist every two months, and visited her counselor every two weeks.[55] Plaintiff explained that she was taking the following drugs for depression: Seroquel, Klonopin, and Cymbalta.[56] In addition to taking the medication, she testified that she began seeing a psychiatrist in 2008.[57] Plaintiff explained that she no longer drank, and she

---

[46] R. at 51, 54.
[47] R. at 56, 59.
[48] Id.
[49] R. at 63-4.
[50] R. at 63.
[51] R. at 67.
[52] R. at 64.
[53] R. at 65.
[54] R. at 69.
[55] R. at 70.
[56] R. at 71.
[57] R. at 74.

also has not taken recreational drugs.[58] Plaintiff explained that her psychiatrist once asked her to check into a psychiatric ward but she did not follow his instructions.[59]

After the ALJ's examination, plaintiff's attorney questioned her. Plaintiff explained that the onset of her symptoms occurred when her son was born, seven years earlier.[60] Plaintiff talked about not following through on plans and having problems with promiscuity.[61] Plaintiff stated that she lacked the motivation to deal with social interactions such as talking with family or household chores such as laundry.[62] Plaintiff explained that when she got a new job, at first she would be excited to work, but as time passed she barely made it to work on time, and some days she did not get out of bed at all.[63] Plaintiff explained that she held many jobs in 2000 and 2001 because she had attendance problems.[64] Plaintiff discussed visits with her psychiatrist, and that she felt that she never found the right balance of medication.[65]

The ME testified that he found more severe restrictions on plaintiff's psychiatric evaluation form than those given by Dr. Henson.[66] The ME gave plaintiff "approaching moderate" restrictions in activities of daily living; moderate restriction in concentration, persistence, and pace; and a mild restriction in social functioning.[67] The ME also noted that plaintiff would be limited to working in an environment with simple instruction on a sustained basis, and brief and superficial workplace contact.[68] He further explained that plaintiff needed to work in an environment where she was not

---

[58]R. at 75.
[59]R. at 76.
[60]R. at 76.
[61]R. at 77, 78.
[62]R. at 79-81.
[63]R. at 81-82.
[64]R. at 82.
[65]R. at 85, 86.
[66]R. at 87, 89.
[67]R. at 89.
[68]*Id.*

required to work with others.[69]  He further explained that she could only deal with ordinary levels of work stress, and that the LCSW's presentation described more severe limitations in functioning than the body of the medical evidence indicated.[70]

Plaintiff's attorney next read the ME a description of Bipolar 1 and the ME agreed it was consistent with the plaintiff's symptoms.[71]  The ME agreed that it was possible that the claimant may cycle between emotional states.[72] Plaintiff's attorney asked the ME to explain the meaning of plaintiff's global assessment functioning ("GAF") score of 50.[73] The ME explained that it signals a moderate level of dysfunction.[74]The ME then stated that plaintiff had a severe impairment and there was a possibility the record supported plaintiff having to miss a day of work every month, if the review were to include Ms. Drake's opinion.[75]

The ME further explained that the January 28, 2010 medical record showed plaintiff had improvement because plaintiff would wake up every one to two hours but fall asleep easily.[76] Plaintiff's attorney posited, and the ME agreed, that there is evidence in the same note that showed plaintiff may not have gotten better.[77] Still, the ME testified that though evidence from Aunt Martha's pointed to mixed improvement, he still believed that the opinion of the LCSW, Ms. Drake, conveyed a higher severity than the other doctors.[78]

_____

[69]R. at 91.
[70]*Id.*
[71]R. at 95.
[72]R. at 97.
[73]R. at 101.
[74] *Id.*
[75]R. at 104.
[76]R. at 105.
[77]R. at 109.
[78]R. at 111.

The ALJ next examined the VE, who listed and classified plaintiff's jobs according to their level of difficulty and required skill set.[79] The ALJ posed several hypotheticals, with the VE suggesting that plaintiff could work as a packer, a laundry worker, or a night store laborer.[80] The VE noted that the job selection would not change if the hypothetical worker could only have brief and superficial contact with coworkers, but the amount of positions would be reduced.[81]

There was also continued testimony regarding counsel's proposed hypothetical of a person who cries every time that person receives criticism, and absenteeism.[82] The VE said that a worker would not be able to miss more than one day a month.[83] Regarding the crying, the VE testified that it depends on the frequency and intensity of the crying, explaining that if an employee were off task more than 10% of the time, then their employment would be problematic and possibly unsustainable.[84]

### D. September 23, 2010 ALJ decision

In her decision dated September 23, 2010, the ALJ ruled that plaintiff was not disabled under 216(i) and 223(d) of the Social Security Act.[85] The ALJ's decision followed a five-step sequential evaluation process for determining whether plaintiff is disabled.[86] The first step found that plaintiff engaged in substantial gainful activity because she made $15,250.40 in 2008.[87] However, the ALJ stated there had been a continuous 12-month period during which plaintiff did not engage in

---

[79]R. at 113-4.
[80]R. at 115-6.
[81]R. at 116.
[82]*Id.*
[83]*Id.*
[84]R. at 129.
[85]R. at 16.
[86]R. at 17.
[87]R. at 18.

substantial gainful activity.[88] In step two, the ALJ found that plaintiff had severe impairments:

bipolar disorder, borderline personality traits, and alcohol abuse.[89] The ALJ stated,

> The record shows that the claimant is obese and has had some
> complaints of back pain and shoulder pain. However, I find that these
> are non-severe impairments as they have not been shown to cause
> more than minimal limitations on the claimant's abilities to perform
> work related activities.[90]

In step three, the ALJ found that plaintiff did not have an impairment or combination of

impairments noted in Title 20 of the Code of Federal Regulations, Part 404, Subpart P, Appendix

1.[91] The ALJ stated that she used Listings 12.04 for affective disorders and 12.09 for substance

addiction disorders.[92] The ALJ stated that while plaintiff had limitations, she was still able to

perform routine activities, get along with authority figures, and follow through on some plans.[93] The

ALJ also found that plaintiff did not satisfy the "C criteria" because plaintiff's disorder did not have

repeated episodes of decompensation.[94]

The ALJ then determined plaintiff's residual function capacity ("RFC").[95] An RFC is "an

assessment of an individual's ability to do sustained work-related physical and mental activities in

a work setting on a regular and continuing basis."[96] The ALJ found that plaintiff had the RFC to

perform a full range of work at all exertional levels, but with the following non-exertional

limitations: "simple, routine, repetitive tasks with only occasional decision making required and only

---

[88]*Id.*
[89]*Id.*
[90]R. at 19.
[91]*Id.*
[92]*Id.*
[93]*Id.*
[94]R. at 20.
[95]R. at 17.
[96]SSR 96-8p.

occasional changes in the work setting with co-workers as well as only brief and superficial interactions with the public, co-workers, and supervisors, and not work in tandem with others."[97] The ALJ found that plaintiff's allegations were not fully credible regarding the severity and persistence of her symptoms and the functional limitations they caused.[98] The ALJ based this decision on plaintiff's visits with the psychiatrist that showed stable findings, her lack of hospitalization for psychiatric treatment, and lack of medication during the severe moments of her ailment.[99] The ALJ explained that the ME was given "great weight."[100] The ALJ stated that the opinion of Ms. Drake was given little weight because Ms. Drake was not an acceptable medical source, no longitudinal treatment had been established at the time of her report, and her clinical findings were not supported by the record.[101]

In step four, based on the VE's testimony, the ALJ held that plaintiff was unable to perform any past work.[102] In step five, the ALJ held that there are jobs that exist in significant numbers in the national economy that plaintiff can perform.[103]

## III.    Standard of Review

The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[104] The Court will uphold the ALJ's decision if it is supported by substantial evidence.[105] Substantial evidence means "such evidence as a reasonable

---

[97]R. at 20.
[98]R. at 25.
[99]R. at 25.
[100]R. at 26.
[101]*Id.*
[102]R. at 27.
[103]*Id.*
[104]*Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).
[105]*Rohan v. Carter*, 98 F.3d 966, 970 (7th Cir. 1996).

mind might accept as adequate to support a conclusion."[106] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner (or ALJ), not the courts.[107] Even so, the decision of the Commissioner is not entitled to unlimited judicial deference.[108] The ALJ must consider all relevant evidence in the record, and may not select and discuss only that evidence that favors his or her ultimate conclusion.[109]

## IV.    Analysis

Plaintiff argues that the ALJ's decision must be remanded because the ALJ erred by: (1) failing to properly consider Ms. Drake's opinion; (2) failing to properly evaluate plaintiff's credibility; (3) improperly considering plaintiff's obesity in combination with her other impairments; and (4) improperly accounting for plaintiff's limits in concentration, persistence, or pace in her RFC determination.

### A.    Consideration of Ms. Drake

In her opinion the ALJ held that Ms. Drake was "not identified as a psychologist or a psychiatrist" and, therefore, was "not an acceptable medical source under the regulations."[110] Plaintiff argues that this was error. The ALJ's statement, however, is indeed correct. The regulations distinguish between medical evidence from "acceptable medical sources" - such as licensed physicians - and what the regulations call "not 'acceptable medical sources'" or "other medical sources," which includes licensed social workers.[111]  But we agree with plaintiff that the ALJ failed

---

[106]*Id.* (quoting *Edwards v. Sullivan*, 985F.2d 334, 336 (7th Cir. 1993).
[107]*Herr v. Sullivan*, 912 F.2d 178,181 (7th Cir. 1990).
[108]*Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997).
[109]*Herron v. Shalala*, 19 F3d 329, 333 (7th Cir. 1994).
[110]R. at 26.
[111]SSR 06-03P.

to note one important point; the regulations still use evidence from these "other sources" to "show the severity of the individual's impairment(s) and how it affects the individual's ability to function."[112]

For example, the Social Security Regulations themselves recognize,

> '[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as ... licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.[113]

There is no doubt, then, that Ms. Drake qualifies as a treating source. And had the ALJ simply found Ms. Drake to be "not an acceptable medical source" and assigned her "little weight" with no additional explanation, such a conclusion would perhaps warrant remand.

The ALJ, however, provided two additional reasons for discrediting Ms. Drake: there had been no longitudinal treatment established between Ms. Drake and plaintiff when Ms. Drake documented her opinion, and no clinical findings in the record supported the severe findings that Ms. Drake noted.[114] We first turn to whether it was appropriate for the ALJ to discredit Ms. Drake's opinion for its lack of "longitudinal treatment." Plaintiff argues that despite Ms. Drake having only met plaintiff four days before providing her assessment to the SSA, she could have based her findings on the year long treatment history plaintiff had at the clinic. This may be true, but there is no indication that Ms. Drake relied on any previous treatment history, or that there was much

---

[112]SSR 06-03P.

[113]SSR 96-03p; *see also Downie v. Astrue,* 2010 WL 1257774, *11 (N.D. Ill. March 24, 2010)(citing the rule).

[114]R. at 26.

treatment history to rely on at Aunt Martha's. In fact, Ms. Drake stated in the RFC form that plaintiff's GAF score for the past year was unavailable.[115]

That brings us to the ALJ's third reason for discrediting Ms. Drake's assessment, which is the lack of clinical findings to "support such severe findings as Ms. Drake opined."[116] Even if Ms. Drake did rely on the records from that year period at Aunt Martha's, there are only a limited few. Dr. Hussain initially noted plaintiff's complaints of "racing thoughts," that she did not leave her home, and that she felt like a "zombie."[117] But the next report found plaintiff was "getting better" and "sleeping better."[118] Even if considered, these do not corroborate Ms. Drake's more extreme report, as the ALJ stated.

Plaintiff also makes the argument that a consideration of both Aunt Martha's and Gateway's records would support Ms. Drake's RFC report. Plaintiff then references the ME's testimony, who was given "great weight" by the ALJ, and who acknowledged that Mr. Drake's assessment was "more consistent" with plaintiff's own testimony about her limitations.[119] But these points do not invalidate the ALJ's given reasons: there is no evidence of longitudinal history or clinic records that support all of Ms. Drake's findings. Even the ME stated that Ms. Drake's "testing describes more severe limitations in functioning that the body of the medical evidence indicates."[120]

An ALJ must "articulate a reasonable basis for rejecting other medical source opinions" that is "grounded in substantive evidence in the record."[121] Here, the ALJ had two supported reasons to

---

[115]*Id.*
[116]R. at 26.
[117]R. at 561.
[118]R. at 560.
[119]R. at 104.
[120]R. at 91.
[121]*Frame v. Astrue*, 11-1062-W TL, 2012 WL 3637583, *9 (S.D. Ind. Aug. 21, 2012).

discount Ms. Drake's findings. With no longitudinal view of plaintiff's treatment history[122] and no indication that Ms. Drake relied on past records to support her finding, the ALJ's decision must be upheld.

### B. Credibility

Plaintiff next argues that the ALJ failed to consider that her impairment would necessarily produce good days and bad days. She also claims that the ALJ improperly discredited her for taking a customer service job for a short time, when she testified that she did it only because she was financially desperate.

As always in these cases, we must reiterate the standard under which we review credibility determinations: with deference. SSR 96-7p states that the ALJ's written decision "must contain specific reasons for the finding on credibility...and must be sufficiently specific to make clear...the weight the adjudicator gave to the individual's statements and the reasons for that weight."[123] We will reverse an ALJ's credibility assessment only if it is so lacking that it is "patently wrong."[124] As the reviewing court, we give the ALJ's determination "special deference,"[125] because "the ALJ is in the best position to see and hear the witness and determine credibility."[126]

First, the ALJ found plaintiff's allegations "not fully credible" because her medical history was more stable than her testimony indicated.[127] The ALJ explained that plaintiff's complaints revealed that sometimes "she is doing better and other times...she is doing worse."[128] But then the

---

[122]*See Cirelli v. Astrue,* 751 F.Supp.2d 991, 1005 (N.D. Ill. Nov. 18, 2010) (noting that "[i]f a medical source's opinion provides no longitudinal view, 'the very reasons the Social Security regulations set out for giving substantial weight to a treating physician's opinion are absent.'")

[123] SSR 96-7p, 1996 WL 374186, at 2; *see also Brindisi ex. Rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir.2003).

[124] *Id.* at 1162.

[125] *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir.2010).

[126] *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000).

[127]R. at 25.

[128]R. at 25.

ALJ explained that plaintiff's psychiatric visits showed stable findings during mental examinations, plaintiff was never hospitalized, no side effects from medications were reported, and the one noted low GAF score was due to plaintiff having been off her medications for 2 to 3 months prior.[129]

We acknowledge the Seventh Circuit's view when assessing chronic disease, especially bipolar disorder. Often, it is a difficult analysis because an individual with this impairment is likely to have "better days and worse days," and may respond "erratically to treatment."[130] In that context, the Seventh Circuit has emphasized the importance of the treating doctor's opinion regarding whether the individual can work full-time.[131] (But ultimately the determination is reserved solely to the Commissioner).[132]

With the exception of Ms. Drake's single report, plaintiff does not rely on a particular treater that should have been credited by the ALJ, but was not.[133] Instead, plaintiff argues that because the ALJ acknowledged that there will be good days and bad days, plaintiff will not likely be able to sustain work. But we do not believe that one statement alone, acknowledging the realistic difficulties of plaintiff's impairment, constitutes a finding that the ALJ was "patently wrong" in her decision to credit plaintiff with certain limitations, and not with others.

The ALJ gave some weight to the State agency psychological consultant, Dr. Henson, who found plaintiff could perform simple, routine activities and that her skills were "adequate for vocational involvement," yet she also found plaintiff "more limited" than his findings.[134] The ALJ

---

[129]R. at 25-26.
[130]*Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008).
[131]*Id*.
[132]*Id (citing Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008)).
[133]*See, e.g., Bauer*, 532 F.3d at 609(attacking the ALJ's decision to discredit the two treating doctor's opinions).
[134]R. at 24.

also relied on the ME, who testified that while there was "some evidence of waxing and waning symptoms," plaintiff's depression appeared to have improved on medication. The ME testified that her impairment was not "severe enough to completely restrict her from being able to perform work activities."[135] The ALJ credited these statements over plaintiff's testimony that there were times when she could not get out of bed.[136]

Next, plaintiff takes issue with the ALJ's comment that her choice to work at "a job involving customer service" undermined her testimony "that she has a problem working with people."[137] We note the ALJ also recognized plaintiff's explanation that "she took the job in 2010 because she has two children and did not have any other choice," stating that though plaintiff did not think she could hold down a job, "she had to do something."[138] Finally, the ALJ found these latter statements to be in contrast with her certifications to receive unemployment, which requires her to certify her ability to work.[139]

We have more difficulty with this reasoning. This Circuit has found that "a desire to work, by itself, should not be used as a negative credibility factor because a desire to work does not necessarily imply an ability to work."[140] But the ALJ's consideration of plaintiff's certification for purposes of unemployment benefits is also a proper credibility consideration, though not determinative. The court in *Schmidt v. Barnhart* articulated this point:

> while we have previously held that "employment is not proof positive of ability to work," we are not convinced that a Social Security claimant's

---

[135]R. at 25.
[136]R. at 26.
[137]R. at 18.
[138]R. at 21.
[139]R. at 26.
[140]*Ison v. Astrue,* No. 10-0711, 2012 WL 832983, *9 (N.D. Ill. March 12, 2012).

> decision to apply for unemployment benefits and represent to state authorities
> and prospective employers that he is able and willing to work should play
> absolutely no role in assessing his subjective complaints of disability.[141]

The ALJ was not, therefore, in error when she noted the potential contradiction. Regarding the ALJ's single statement questioning the customer service job, this is slightly confusing because the ALJ was both acknowledging plaintiff's claims that she had no choice but to take the job, and also questioning her credibility based on her choice to take that particular type of job. Despite what is perhaps an unclear point made by the ALJ, we cannot say that the ALJ was "patently wrong." Ultimately, the ALJ relied more heavily on the State agency physicians, and the ME, who both concluded that plaintiff could perform work. The ALJ also explained why she gave those opinions more weight than plaintiff's claim that she only worked out of desperation, but could not keep a job.

### C.    Obesity

Plaintiff also argues that the ALJ failed to consider plaintiff's obesity in combination with her bipolar disorder. Here, the ALJ found plaintiff's obesity, as well as her back and shoulder pain, to be non-severe impairments. Plaintiff did not claim, at any point, that her inability to work related to her physical impairments or, specifically, obesity. Rather, her focus was consistently on her mental impairments.[143] Plaintiff would like us to follow our same analysis in *Fleming v. Astrue,* where we remanded for an evaluation of the claimant's obesity.[144] But that case is factually distinct. There, the claimant's obesity was a severe impairment and there was confusion regarding her actual BMI, and whether the ALJ relied on the proper calculation.[145] There is simply no similarity here where, even if we remanded for more discussion on obesity, the ALJ would have no additional - or

---

[141]395 F.3d 737, 746 (7th Cir. 2005) (quoting *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir.1998)).
[143]R. at 21.
[144]No. 10-3043, 2011 WL 1793260, *10 (N.D. Ill. May 10, 2011).
[145]*Fleming,* No. 10-3043, 2011 WL 1793260 at 10.

different - medical evidence or testimony to assess. As noted by the Commissioner, the ALJ found

that plaintiff's obesity and physical ailments "did not cause more than minimal limitations" on her

ability to work,[146] and no treating, consulting, or reviewing physician opined otherwise.

### D. Plaintiff's limitations in "concentration, persistence, or pace"

Plaintiff argues that the ALJ found she had moderate limitations in maintaining

concentration, persistence, or pace but, because the limitation was not explicitly stated in the RFC

determination, remand is required. After noting the "paragraph B" criteria of Listing 12.04 - of

which one was plaintiff's "moderate limitation" in concentration, persistence or pace - the ALJ

stated that she accounted for those limitations in concluding plaintiff's RFC to be limited to,

> simple, routine, repetitive tasks with only occasional decision making
> required and only occasional changes in the work setting as well as only brief
> and superficial interactions with the public, co-workers, and supervisors, and
> not work in tandem with others.[147]

Then, when the ALJ questioned the VE, she limited her hypothetical to the following,

> simple, routine and repetitive tasks where only occasional decision-making
> is required and only occasional changes in the work setting and that the
> claimant has only occasional interaction with the public...

We find no support for plaintiff's position that the ALJ was required to include an explicit limitation

in concentration, persistence or pace in the RFC and, therefore, in the hypothetical to the VE. "It is

true that a valid hypothetical question must ordinarily include limitations that an ALJ finds for a

claimant's RFC."[148] Here, the hypothetical was "entirely consistent" with the ALJ's RFC finding.[149]

---

[146]R. at 19.
[147]R. at 26.
[148]*Allbritten v. Astrue,* No. 11-116, 2012 WL 243566, *7 (N.D. Ind. Jan. 25, 2012).
[149]*See Allbritten v. Astrue,* No. 11-116, 2012 WL 243566 at *7(noting nearly identical findings by the ALJ and using the same language in the hypothetical).

Our sister court has already addressed this same issue in *Allbritten v. Astrue*.[150] In that case, like here, the ALJ limited plaintiff to simple, unskilled work in the RFC, but had found her to have "moderate difficulties with regard to concentration, persistence, or pace" earlier in the decision. In reviewing the ALJ's decision, the *Allbritten* court stated that the limitation in concentration, persistence, or pace was "made in the context of analyzing, at step three, whether plaintiff's condition met or equaled a listing."[151] That is precisely what happened here. And just as in *Allbritten,* here plaintiff relies *O'ConnorSpinner v. Astrue* to claim that remand is warranted for the sole reason that the ALJ did not include a hypothetical to the VE with moderate limitations in concentration, persistence, or pace.[152] But the two cases are distinct. The ALJ in *O'ConnorSpinner* had, in fact, listed that limitation in the claimant's RFC, so it was incumbent upon the ALJ to include all RFC limitations in the hypothetical.[153] Because we did not have that omission here, there is no basis for remand on this point.

---

[150]No. 11-116, 2012 WL 243566.

[151]*Allbritten v. Astrue,* No. 11-116, 2012 WL 243566 at *7.

[152]*Id.*

[153]*See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) (finding that "there may be instances where a lapse on the part of the ALJ in framing the hypothetical will not result in a remand. Yet, for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do.")

**V.      Conclusion**

For the reasons set above, the plaintiff's motion to remand is denied [dkt. 27] and the

Commissioner's motion for summary judgment is granted [dkt. 30].


IT IS SO ORDERED.

Date: <u>June 4, 2013</u>

Susan E. Cox
U.S. Magistrate Judge